**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 09-8018-PHX-GMS |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Calvin Bryan Evanston, | ) | |
| Defendant. | ) | |

Pending before this Court is Defendant Evanston's Motion To Suppress Statements (Dkt. #19). For the following reasons, the Court denies the motion.

In his motion, the Defendant moves to suppress any statements he made in four separate encounters with law enforcement. He moves first to suppress any statements he made when he met with FBI Special Agents Keegan and Barber and Investigator Barnett of the Colorado River Indian Tribes ("CRIT") Police Force at his home on August 15, 2008. He so moves because he alleges both that: (1) the encounter was custodial and he was not given Miranda warnings; and (2) he was intoxicated and the statements were not voluntarily given.

The Defendant next moves to suppress any statements he made in his next three encounters with law enforcement personnel for the reason that his waiver of Miranda rights

on those occasions was not intelligently and knowingly given.[1] He further asserts that his chronic alcoholism prevented him from giving voluntary statements on these occasions, even though he was not under the influence of alcohol.

The Court held an evidentiary hearing on the motion on Wednesday October 21, 2009. At the hearing, five witnesses testified on behalf of the Government. Other than the cross-examination of the government's witnesses, no evidence or testimony was offered by the Defendant.

**I.      August 15, 2008 Meeting.**

On the morning of the 15th of August, 2008, Special Agent Keegan, Special Agent Margo Barber, and Investigator Barnett from the CRIT Police Force went to question the Defendant at his home about an assault that had occurred on his girlfriend Pamela Burlew. He was a suspect by this time because Burlew had identified Defendant as her assailant. But, according to Special Agent Keegan, she did not travel to the Defendant's home with the intent of arresting him. She wanted to get his side of the story, and, at any rate, the logistics at the time would not permit her to make an arrest. Although she was aware that Mr. Evanston might incriminate himself during the interview, neither she, nor any of the law enforcement officers present, provided the Defendant with *Miranda* warnings prior to speaking with him.

Both Special Agent Keegan and Investigator Barnett testified that Mr. Evanston voluntarily met with them, understood and was responsive to the questions posed to him, and made no request for the agents to leave his home or stop the interview. Both agents testified that no tricks, threats, or force were used against him in the interview, and that Mr. Evanston was congenial and responsive throughout the interview until Special Agent Keegan told him that Ms. Burlew identified him as her assailant, and asked Defendant if he committed the

---

[1]These encounters include his interviews with: (1) FBI Special Agents Barber and Keegan on August 21, 2008; (2) CRIT investigators Barnett and Harper on September 18, 2008 and (3), FBI Special Agent Fuller and CRIT Investigator Barnett on October 6, 2008.

assault. At this point in the interview, the Defendant asked Special Agent Keegan how long it would have taken him to get from Basha's to his home. Special Agent Keegan then detected a whiff of alcohol coming from the Defendant. She did not see any alcohol containers, however, and had not previously during the interview detected slurred speech or physical impairments from the Defendant during the interview. At the suggestion of Investigator Barnett, the law enforcement officers then terminated the interview without taking the Defendant into custody.

Investigator Barnett testified that he was dressed as a civilian during the interview, but that he did have a firearm with him. He does not remember whether Agent Keegan had a firearm. He similarly testified that Defendant was responsive to the questions asked during the interview, but at some point during the interview, he perceived that Defendant had consumed alcohol and noticed that he had bloodshot watery eyes and slurred speech. He then suggested they terminate the interview and that the Defendant never asked them to do so. Investigator Barnett said that he did not believe that Defendant was incapacitated by his alcohol consumption, and that based on his several years of experience with the Defendant's various ranges of intoxication, he felt that Defendant was able to participate in the interview. He nevertheless thought caution dictated that they end the interview at that point.

**A. Defendant was not in custody during the interview in his home on August 15.**

A defendant has been taken into custody when the defendant has either been arrested or "otherwise been deprived of his freedom of action in a significant way." *Miranda v. Arizona,* 384 U.S. 436, 444, 479 (1966). In making this determination a court must examine "all of the circumstances surrounding the interrogation" and "decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Bassignani,* 575 F.3d 879, 883 (9th Cir. 2009) (citing *United States v. Kim,* 292 F.3d 969, 973 (9th Cir. 2002). Factors relevant to that determination include "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the

duration of the detention; (5) the degree of personal pressure applied to detain the individual." *Id.*

Application of these factors to the facts here indicates that the Defendant was not in custody. The Defendant voluntarily agreed to meet with the agents in his home; therefore, he was not "summoned" by the law enforcement agents in a way that would be coercive.

The only time during the interview that Defendant was confronted with evidence of his guilt was at the very end, when Special Agent Keegan confronted him with the assertion that Ms. Burlew had identified him as her assailant. The Defendant responded by asking how long it would have taken him to return home from Basha's. During that response, Special Agent Keegan detected that the Defendant had been drinking and, at the suggestion of Investigator Burnett, terminated the interview. The agents did not take the Defendant into custody at the end of the interview. This single instance of confrontation at the end of the interview was not sufficient alone, or in combination with the other existing circumstances, to make the interview "custodial."

The interview also took place in the Defendant's home. Generally, an interview that occurs in surroundings that are familiar to the Defendant, weights against a finding of custodial investigation. *See United States v. Craighead,* 539 F.3d 1073, 1083 (9th Cir. 2009) (noting that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature"). In *Craighead* the Ninth Circuit found that a police interview was a custodial interrogation even though the interview took place in the defendant's home because that interview was police dominated. *Id.* at 1085.

In *Craighead,* there were eight officers present at the interview in the defendant's home. All of the law enforcement personnel were armed, some wore protective gear, and some unholstered their firearms in Craighead's presence. *Id.* Craighead was escorted to a back storage room in his home, and the door was closed behind him. *Id.* at 1086. One of the interviewing officer's leaned with his back to the door, so as to block Craighead's exit. *Id.*

By contrast, there is no indication that the interview here was dominated by law enforcement. The interview was cordial and non-confrontational. The law enforcement

- 4 -

officers were not in uniform. Although there were three law enforcement officers present, only two participated in the interview. While, at least Officer Barnett was armed, there is no evidence that he, or any other officer, unholstered his weapon in Defendant's home. Defendant was apparently alone in the home at the time, but the officers did not restrain him or lead him to a confined space in which to conduct the interview. Although they did not inform the Defendant that he was free to leave, his ability to leave the room was not impeded. The Defendant voluntarily participated in the conversation, he was not coerced in any way, and the officers terminated the interview on their own volition without taking the Defendant into custody.

While the duration of the interview is not entirely clear, based on the descriptions of the interview and when and why it was terminated, the Court finds that the interview was relatively brief, and was not so long as to be coercive or to constitute a custodial interrogation. Nor does it appear from the description of the interview that any degree of personal pressure was used to detain the Defendant. By all accounts he voluntarily participated in the interview in a cordial manner, was not "detained" during any part of it, and the law enforcement agents voluntarily left within a short time. They used no tricks, and made no promises or threats.

The testimony in the record supports the government's assertion that the interview in Defendant's home that occurred on August 15 was not custodial. Therefore, the argument that the statements were given in violation of Defendant's rights because Defendant was in custody, is rejected.

**B. Defendant's Free Will Was Not "Overcome" By Any Alcohol Consumption.**

Intoxication does not prevent a defendant from providing a voluntary statement to law enforcement unless the intoxication is sufficiently intense to overcome the Defendant's "free will and cause his [] statement[s] to be the product of anything other than a rational mind." *Medeiros v. Shimoda,* 889 F.2d 819, 823 (9th Cir. 1989), *cert. denied,* 496 U.S. 938 (1990) (quoting *Townsend v. Sain,* 372 U.S. 293, 307 (1963)). In *Medeiros,* when the defendant made the questioned statement, "his eyes were red and glassy, his voice was loud, . . . he was

1 unsteady on his feet," and shortly thereafter he had a blood alcohol level of approximately 0.19. Nevertheless, the Ninth Circuit determined that his obvious intoxication did not overcome his free will because he was not "incapacitated." *Id.* at 823. "He was able to drive an automobile, obey the officer's orders prior to and during the initial stop, and to cooperate in conversing with them." *Id.*

Here, although the agents both eventually detected alcohol, the Defendant was responsive to their inquiries and congenial. Even assuming the Defendant was intoxicated, there is no basis on which the Court could conclude that the Defendant was incapacitated when he made any of his statements in the interview on August 15.

**II.     The Remaining Three Interviews**

Defendant acknowledges that he was given *Miranda* warnings before each of the interviews he had with law enforcement once he was taken into custody on tribal charges. He agreed to speak with law enforcement on each occasion. His brief, however, alleges that, because he had already been arrested, arraigned and finally detained on tribal charges stemming from the alleged assault and because he did not have the right to have counsel appointed for him on the tribal charges, he was likely confused as to the right to have appointed counsel prior to questioning on federal charges arising from the same occurrence.

**A. Background**

**1. August 21, 2008 Meeting**

Special Agent Keegan testified that she returned to the CRIT Detention Center with Agent Barber on August 21 to speak with the Defendant after he had been arrested and detained on tribal charges. Prior to asking him any questions, she reviewed with the Defendant the Advice of Rights form, admitted as Exhibit 2 to the suppression hearing. She read each individual right contained on the form and asked Mr. Evanston if he understood each right. He indicated he did, and Agent Keegan had him initial next to each right as she reviewed it with him to insure that he understood it. The form reflects that the Defendant was advised and understood that: (1) he had the right to remain silent; (2) anything he said could be used against him in court; (3) he had the right to talk to a lawyer for advice before

he was asked any questions; (4) he had the right to have a lawyer with him during questioning; (5) if he could not afford a lawyer, one would be appointed for him before any questioning if he wished; and (6) if he decided to answer questions without a lawyer present, he had the right to stop answering at any time. The Defendant then signed the form indicating he understood these rights as a whole and chose to waive them. The form was witnessed by Special Agents Keegan and Barber.

Special Agent Keegan testified that, during the interview that followed, the Defendant described in some detail what he did on the day of the assault, and denied assaulting Ms. Burlew. Special Agent Keegan stated that he was pleasant throughout the interview. She made no attempt to trick or coerce him during the course of the interview.

**2. September 18, 2008 Meeting**

On September 18, at the request of the FBI, Investigator Barnett and Officer Harper from the CRIT police force met with the Defendant. The FBI requested that Barnett and Harper interview the Defendant, because, two days earlier, the Defendant had declined to speak again with Agent Keegan but had expressed some desire to speak with Investigator Barnett. The CRIT Police Department agreed to have the witness interviewed by Investigator Barnett and Officer Harper.

Special Agent Keegan provided Investigator Barnett with a standard Advice of Rights form used by the FBI identical to the one she had previously used in her August 21 interview with the Defendant. Prior to asking any questions, Officer Barnett reviewed each of the rights in the form with the Defendant and had the Defendant write his initials next to each right. The Defendant then signed the Waiver of Rights and the waiver was witnessed by Investigator Barnett and Officer Harper. Both testified that they were present when Barnett read to the Defendant his rights. They also testified that they were present when the Defendant initialed and signed the form indicating that he waived his rights, and said he was willing to talk. This form was admitted as Exhibit 3 to the hearing. The officers did not explain the difference between the federal charges which were pending and the tribal charges for which he was already arrested.

During the interview the Defendant again relayed an account of his actions of the day of the assault. He again denied Burlew's accusation that he was her assailant. He acknowledged that he had a "rocky" relationship with Burlew and claimed that he had taken the fall for earlier disputes between them. At the end of this interview, Barnett asked the Defendant if he had anything else to add. The Defendant indicated that it was possible that he assaulted Ms. Burlew, but he was pretty sure that nothing happened. When Barnett asked him to submit to another interview and a polygraph examination, the Defendant agreed to do so. During this interview the Defendant was responsive to the questions asked, was not under the influence of alcohol, never asked to speak to a lawyer, take a break, or terminate the interview. He was never threatened nor did he receive any promises. He had a cordial relationship with Investigator Barnett. The total interview lasted approximately an hour and a half.

### 3. October 6, 2008 Meeting

On October 6, 2008, Defendant Evanston met with Investigator Barnett and Special Agent Fuller. Agent Fuller was there to administer the polygraph test. Agent Fuller began the interview by again reviewing the Advice of Rights form, admitted as Exhibit 4 to the hearing, with the Defendant. The Defendant indicated he understood his rights and wished to speak with the officers. Thus, the Defendant signed Exhibit 4 indicating he desired to waive his *Miranda* rights. Agent Fuller then reviewed, and the Defendant signed, exhibit 5 to the hearing which is the Defendant's consent to interview with polygraph. During the pre-interview prior to the polygraph, the polygraph test itself and the post-polygraph interview, neither Fuller nor Barnett made any threats or promises to the Defendant and used no tricks during the interviews. They saw no reason to believe that the Defendant was under the influence of alcohol, and they afforded the Defendant all the breaks he requested.

The Defendant's signature on both Exhibits 4 and 5 is witnessed by Fuller and Barnett. After administering the polygraph test, Agent Fuller indicated to the Defendant that the polygraph indicated evasive behavior. The Defendant then acknowledged striking Burlew on the day in question and repeated his confession upon the return to the interview

1 room of Inspector Barnett, who had not been present during the polygraph test. Agent Fuller
2 testified that he fully disclosed his identity to the Defendant, that Defendant did not appear
3 to be on any substances, that he gave the Defendant at least two breaks during the pre-
4 interview, polygraph, and post-interview process. He also testified hat he neither made
5 promises nor played tricks on Defendant during the interview, that his entire time with Mr.
6 Evanston constituted approximately two hours, and that the Defendant never asked him to
7 stop the interview, nor requested a lawyer.

**B. Analysis**

The Government bears the burden of proving a valid waiver of *Miranda* rights. This requires a showing "that the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Garibay,* 143 F.3d 534, 536 (9th Cir. 1998). The testimony at hearing established, and the Defendant does not contest, that on each of the three occasions that the Defendant spoke with agents prior to his arrest on the federal charges, the officers read and reviewed with the Defendant each of his rights under the federal Notice of Rights. That waiver of rights explicitly indicated that the Defendant had the right to remain silent, the right to have a lawyer present during questioning, and other associated rights. It also indicated that "[i]f you cannot afford a lawyer, one will be appointed for you *before any questioning* if you wish." (emphasis added).

Prior to entering the interviews, the Defendant indicated to the agents that he understood his rights. Then he signed all three of the forms indicating he wished to waive these rights. On the first two forms, he further placed his initials next to the right that indicates that if he could not afford a lawyer one would be appointed for him if he wished prior to any questioning. This indicates that the right had been individually reviewed with him. The testimony is uncontested that he never requested a lawyer prior to the questioning. Instead, he went ahead and conversed with the agents.

The Defendant's brief speculatively argues that the Defendant did not realize that he had the right to counsel prior to being questioned on the federal charges if he was indigent, because he would have been advised, on the tribal charges, that he had the right to counsel

- 9 -

only if he procured counsel for himself. Thus, the brief continues to assert, Defendant would have presumed that he had no right to appointed counsel under additional questioning. Nevertheless, the contents of each of the notices signed and initialed by Defendant prior to the questioning is convincing evidence to the contrary.

Despite the statement in his brief that he would supplement his motion to suppress with testimony at the evidentiary hearing, the Defendant presented no testimony or evidence. In the Court's evaluation of the evidence, nothing Defense counsel elicited on cross-examination was sufficient to counterbalance the clear statements made to the Defendant prior to each interview that he had the right to have appointed counsel prior to questioning if he could not afford one. Thus, the Court could not ascertain if the Defendant actually did not understand the plain language of the waiver of rights he signed and initialed and what, if anything, was the basis for the Defendant's confusion.

The Court is also unable to ascertain what the Defendant was advised on his tribal arrest[2], whether any tribal officer even sought to question the Defendant after he received any such warning, whether the Defendant sought counsel prior to such questioning, and thus whether there might have been any objectively valid basis for confusion.

Defendant argues that *United States v. Doherty,* 126 F.3d 769 (6th Cir. 1997), *abrogated by Texas v. Cobb,* 532 U.S. 162 (2001), supports his argument.[3] In *Doherty,* federal agents not only read the federal waiver of rights form to the Defendant, but explained to the Defendant the difference between tribal and federal charges before doing so. The Court ultimately affirmed the conviction that resulted, at least in part, from Doherty's resulting confession. *Id.* at 783. The Sixth Circuit's analysis, however, focused on whether

---

[2] The testimony of the CRIT officers who did testify indicates that the content of the Miranda warning given during a tribal arrest is not a topic on which there is much clarity.

[3] Defense Counsel did not do the Court the favor of indicating in his brief that *Doherty* had been abrogated in substantial part by the United States Supreme Court. But, the Court acknowledges that the abrogation, while it might affect the Defendant's argument in several particulars, would still permit the argument to be made in good faith.

Doherty had invoked his right to counsel on the federal charges by also seeking to obtain counsel on the tribal charges. Its analysis does not address whether a knowing waiver depended on a complete explanation of the difference between federal and tribal charges..

The Defendant asks the Court to presume that the review of the distinction between tribal and federal charges that occurred in *Doherty* is a necessary prerequisite to a knowing *Miranda* waiver in any federal investigation of conduct that also constitutes a tribal crime. Defendant also asserts that *Doherty* stands for such a proposition. Observations made in *Doherty* permit Defendant's supposition, but do not provide much support for it even in dicta.. The Court agrees that in certain circumstances, the failure to clearly explain to the Defendant the difference between tribal and federal *Miranda* rights could serve to invalidate what would have otherwise been a valid waiver of *Miranda* rights. But, in light of the clear and frequently repeated instruction given to the Defendant that he had the right to have counsel appointed for him prior to questioning if he could not afford one, and the lack of evidence or testimony presented by the Defendant that would establish why he did not understand the plain language of the warning, this is not such a case.

Although he states in his brief, in a single sentence, that his statements in these interviews were not voluntary based on the effects of his longstanding alcoholism, he does not develop this argument in his brief, nor did he present any testimony supporting it at the hearing. Therefore, for the reasons stated in part I(B) above, the Court does not find that Defendant's free will was otherwise overcome in any of his interviews. Therefore,

**IT IS HEREBY ORDERED** denying Defendant's Motion to Suppress (Dkt. # 19)

DATED this 4th day of November, 2009.

_____
G. Murray Snow
United States District Judge